It's like an icebox in here. We're trying to keep you awake. All right, we have only three argued cases before the court this morning and one submitted case. The first argued case before the court is Miskill. Is that pronounced properly? Yes, Your Honor. Versus SSA, Social Security Administration, Mr. Gagliardo. Yes, ma'am. You want five minutes for rebuttal. Is that correct? Correct, Your Honor. All right, you may begin. Thank you. Good morning, Judge O'Malley, Judge Stolz, Judge Hughes. There were two reasons for this appeal. The first is the obvious one, and that is to seek relief for Ms. Miskill. But the second one, which is equally and perhaps even more important, this appeal was brought to assure that arbitrators comply with the law. And it's well established that arbitrators must follow the jurisprudence of the Merit System Protection Board and this court. In this particular case, we are arguing that the arbitrator's disregard of Proffert, the treatment of similarly situated employees, was clearly in error. Can I ask you about the stipulation that was entered into that there was an investigation ongoing? Yes. Were there any other details, or was this just, I mean, why did you enter into such a barefaced stipulation that doesn't tell us the facts of that investigation? It's an appropriate question, to say the least. In retrospect, I've asked myself the same question. My co-counsel, Ms. D'Agostino, and I were talking about that this morning. The short answer is that we felt that it was of little significance, the details were of little significance, that two years had passed. Well, how can that be true? I mean, I understand your point, but we don't know when the investigation occurred. If the investigation started immediately after your client's removal, then it might be more relevant that there's an investigation than if it was two years later or the like. It just seems to me very difficult for us to say, to look at the stipulation and then fault the arbitrator when you agreed that there was an investigation. The way I look at it is simply this, Your Honor. Two years had passed since the last charged offense. More than a year had passed since the agency divulged to the union on behalf of Ms. Miskell what these other employees had, in fact, done. Right. To me, it defies credulity, and it would not even meet a substantial evidence test that two years after the fact you say, well, we haven't decided yet, which allows the arbitrator to say, well, if you haven't decided, then they're not comparable. It's not logical. It defies credulity, as I've already said. Do you have any additional information about what's going on with those investigations? To our knowledge, and agency counsel is here as well as the Department of Justice counsel, might elucidate this, but I have no knowledge that anything has ever been done about this, other than that one mention, which was mentioned, so to speak, at the 11th hour. We had no idea. So it's your position that even though the agency claimed that they didn't really know about all these discrepancies to your own client and her sister, I guess it was. Correct. Figured out what these records really showed, that the mere fact that they weren't even looking at the other records and the other employees in and of itself shows a difference in treatment. It does, and it shows something else. It shows that despite the conclusory statement that this is a very serious offense, and I see a lot, I'm union counsel, I see a lot of proposals and decisions, and I've yet to see one that says, you know, this really isn't serious, no matter what the offense might be, and regardless of what the proposed penalty is. So if we look at the facts that are reduced on this record and weigh whether or not this truly is a serious offense, because that's part of the calculus, that's the agency's primary argument, that it's harmless error, because even if this is so serious, it's justified. But let's look at the facts. Mr. Schwab, who's the immediate supervisor, who was the supervisor of seven of the eight comparators, said he didn't enforce time and attendance. He didn't know whether people were filling out their time slips. He didn't look. He sat in his office. That's his testimony. It's uncontroversial. Can I ask you, those comparators, and you said he's the supervisor, did they all work with your client in the same office or the same division? With one exception. And how big was that office? I think it was eight employees. Wait, so it's essentially all of them? I'm sorry, Your Honor. It's essentially all of them. I believe that's correct. And she's in the middle of the path. That is correct. And what was the discovery that she asked for to get those time records? Did she say, could you give me the time records of my entire department, or did she say, could you give me the time records of employees X, Y, and Z? No. You know, now that you say that she asked for X, Y, and Z, I'm not sure. I was going to say she asked for the whole department rather than specified employees. But I'm not clear. Well, she ultimately got the whole department, right? She got everybody's record, yes. If I can just elucidate for one more moment on this question of seriousness. In sum, what I really think the agency and what Mr. Schwab was saying is, look, these are high-level technical people. These are highly skilled IT people. And they service, as is set out in the brief, they service both internal and external. They call them customers. I find that an odd phraseology, but they're known commonly as internal and external customers. And so they go any number of places in order to perform their duties. It's not like they're sitting at a fixed desk, which, again, says something about how important is time. This is not an assembly line. This is not a receptionist. This is not a guard. People that have their presence at a particularly specified time is highly important. They go and they do their work, and they're self-motivated, self-directed people. But she doesn't really dispute that there were many times where she can't establish that she was at some other location and that she was doing personal things. Yes, the record is somewhat vague in this regard. She says there were times when I would go and service an external client, but I can't tell you if on a certain date I was here or there. I thought that your appeal really was focusing on this Douglas factor in her treatment compared to others. So I don't know how this factors into that. But I have a question for you about could the arbitrator have stayed the arbitration until the results of these other investigations were found? I mean, what could the arbitrator have done in this circumstance where the investigations were ongoing? Is there anything? Well, I suppose, you know, in the abstract, I suppose the arbitrator who controls the hearing can do whatever he or she chooses to do as provided it's not contrary to law. Did you ask for a stay or anything like that? We did not ask for a stay. See, we thought, and perhaps it's, well, I'll admit it's my mistake. I thought that the stipulation was of no great consequence, that the mere fact that it was so far after the fact that really it was a pretext because it's really an invitation to lie if I can be that bold about it. If you say, you know, all an agency would ever have to do is come in and say, you know, there are other people who are under investigation. But that's the problem with the way you stipulated to this. It doesn't give us any facts. It may be that it's a pretext. It certainly seems a little shaky given the timing, but it may have been they had some good faith reason that they didn't learn of this until your client asked for the information. Once they got it, it took, you know, again, a year seems like a long time, but it took some time for them to put the investigation in. Or it may be that the investigation didn't start in 16. It may have started in 15. And so it's hard to tell whether or not the investigation was done in good faith without more details. But the arbitrator should have inquired on that. What we said in the brief is that once we raise a disparate penalty, the burden shifts to the agency to show why there's a difference. So it was their burden to show why, to answer the questions that you've just asked me. But you didn't make them prove their burden because you stipulated to an investigation. Well, again, really the investigation was done by our witness who took these records and spoon-fed the results to the agency. The investigation was done. We did it. Look, I get it. I mean, if they came up with this notion of instituting an investigation in 16 right before the arbitrator was going to decide, that's extremely problematic. But if what happened was maybe they weren't as up to speed as they should have been, but as soon as they found out that your client had requested the information and they went back and looked at it, and then they started an investigation into all of these other people themselves, that seems to be good faith. And so whether or not they can be used by comparables might be up in the air. But we don't know any of that. But, see, the comparability is this. And a year after the information is marshaled and several months after the analysis is provided to the agency, they say, well, we still don't know what we're going to do. Do I understand the investigation of Ms. Miskell? How long did that take? Is that clear on the record? Two months, I think. Yeah, it wasn't very long. From the beginning of the investigation until the recommended discharge, it was two months. Thank you, Your Honor. But the other point is, as I understand what you're saying, is that Douglas' similarly situated factor is not simply a stand-alone, are you being treated differently? It goes to the whole question of how serious the offense was because if this was a pattern and practice that the management authorized, then it might not be such a serious offense. Exactly the point. Exactly the point. And we think that that is the heart of this case. I mean, you know, personally, did I think when we asked for that information we were going to find out that there were all these other violations? No, I did not. I mean, I would think quite the contrary. In fact, federal supervisors are charged with certifying time and attendance records, and it's on them when they certify and say, yes, this employee really worked as stated in this form. There's supposed to be a check and balance system. In this case, the supervisor said, I don't know. You know, he didn't say it, but if you look at the whole situation, basically the proper inference is he didn't care. That's why I said they were more concerned about what got done, how well it got done by these independent professionals than when it got done. So just to confirm the two months, I think that comes from the anonymous complaint on June 19, 2013, and then the notice of removal was August 16, 2013? Correct. Okay. If I can just address your point. I know I'm in my rebuttal time, and I don't really want to use it up. The link is the reason I was addressing the seriousness is that the agency's argument is that it's so serious that even if there's a disparate penalty, you lose because it's harmless error. That's set out in their brief, and that's why I'm attacking this whole notion of seriousness, because I don't think this agency treated in Ms. Miskell's case or that division's case these time and attendance matters as seriously as they claim. Okay. Save the rest of your time. I do have a little rebuttal left. Thank you, Your Honors. I appreciate it. Good morning, Your Honors. May it please the Court. Do you know what's happened with the investigations? I do, or at least I've been informed of what happened, so I can't say for certain because it's not in the record. What we do know is that the arbitrator made a decision based on the information he had. No, no, I don't care. What's the answer to what's happened with the investigation? The answer to the question is, and I think it would be helpful to lay out the timeline a little bit better. I think you should just answer the question. Okay. Well, so the information that the analysis that was provided by Ms. Miskell's sister regarding the time discrepancies was provided to the SSA leading up to the arbitration. We have a date in our brief. It's not on the record, but it's June 17, 2015. That's two months before the arbitration. So that analysis did, in fact, prompt a verification procedure by the SSA,  You're not helping yourself. I mean, this information was in your possession at the time you removed her. I just want to know what happened. Did you investigate these people? Was any adverse actions taken against any of these other people? So at the time of the arbitration— Let me make it simple. This is a yes or no question. Were any adverse actions taken against any of these other people? After a supplemental investigation was done, they found a vast improvement for the period between— Is the answer no? No. There was counseling for two of the individuals. No one was removed. No one had anything other than counseling? There were two counselings, and that was concluded long after the investigation— or long after the arbitration had concluded. But so wait. So you're saying, you know, you fire Ms. Miskell, all these other people, some of whom had worse problems than she did, they got scared after you fire her, and maybe they'd get better after a couple years, and so all you do is counsel them. But that doesn't change the fact that their prior record was just as bad as hers. For the period between 2011 and 2013, what we do know is at the time of the arbitration, they hadn't had even a Weingarten counseling session because that information was new to the SSA. What do you mean it's new? You guys provided the documents. I mean, you had the documents. You went and looked at the turnstiles, so you had the material. You can't say it's new. You sat on it and didn't do anything with it. You let her have to go through the whole analysis instead of doing it yourself, but it wasn't new. And I think that does raise the important question of, you know, a persuasive case could be made that SSA could have been more vigilant, you know, when this information was requested. The whole department was requested. I don't understand why you're talking about when this information was requested. When the deciding official made a decision on her proposed removal, he was obligated to undertake a proper Douglas factors analysis. If he had undertaken that proper Douglas factors analysis and realized, ooh, we have a huge time and attendance problem here, maybe I bet, and we've also, you know, somebody else has resigned in the face of a similar thing, maybe I better look and see what my other employees are doing. He didn't do that, and nobody apparently did that until she brought that information to your attention. How is that a proper Douglas factors analysis? Well, so the Douglas factors analysis, at least according to what was understood at the time, is it's a disparate treatment analysis based on actions the agency has taken on precedent individuals. At the time, what the deciding official had was one prior instance, this individual named Lynn Hawley, who was given a Weingarten counseling session, was told that they were going to propose her removal and chose to resign. Mr. Schwab came onto the job in 2015, saw that this individual had been anonymously complained of through an OIG complaint, conducted the investigation, and then held a meeting. Meaning he didn't do the Douglas factor analysis that he was supposed to do. Well, he did it based on the precedent information that he had. Ultimately, when Ms. Miskell was charged... There were eight people under his charge. There were eight people, and he had records that he could access because he accessed hers. So he didn't do the analysis of all those who were in the same department. So there was an OIG complaint that came in specifically to Ms. Miskell. And so Mr. Schwab realized, okay, we should do the investigation or analysis with respect to her. But when Ms. Miskell then asked for the time entry information for everybody else in her department, and then there was no investigation of those folks for, I mean, how long did it take? I mean, between the time that the government provided the information until the time of the arbitration, how much time was there? So this is where I think that timeline would, in fact, be helpful. That information was... So Ms. Miskell was removed September 28, 2013. The information was requested February, March 2014. Then the analysis was provided to the SSA June 17, 2015. The arbitration occurred September 2, 2015. But the decision didn't come down right away. So you're saying that there was over a year, even after she requested the information, where the agency did nothing. And if it took only two months to analyze her data, you're telling me that you couldn't have analyzed it even between the time she supplied it in June and the time of the arbitration? Well, what I'm saying is we're talking about an entire department that was sought. Eight people. Right. You took two months to do hers. You're telling me you could not have done the analysis from, say, January or February until November? Well, I think first, on June 17, what was provided to the SSA was a verification analysis provided by Ms. Miskell. But who cares what she provided? It's not her obligation. It's your obligation to prove that she was comparably treated to other people. And even if you didn't do it at the time of the removal, you should have been on notice when she requested information about all of her coworkers that she was looking at this. Why didn't you do the similar analysis that she did then? Upon the request of the data. Well, you know, upon the request of the data, the parties are in litigation. And I don't intend to make excuses for this, because I think in hindsight we could say they could have done this better. And I think we agree on that. But at the time, the parties are in litigation. An RFI was requested for an entire department. There was a reason to feel that this was just requesting information to see if they could shore up a defense. When someone is assessing whether they should fire someone based on an anonymous tip, shouldn't they look to see the extent to which these time and attendance policies were enforced throughout the department? Isn't that part of the overall seriousness analysis? So according to Chavez, what Chavez says, and this is an MSPB decision, so it certainly doesn't bind this court. But this is what's guiding, I guess, the agency at the time. They're looking at contemporaneous conduct that has been charged, and that's what Chavez says. And at the time, no one else other than a precedent employee, Ms. Lynn Hawley, had been charged. So what they did as part of the sixth factor, the Douglas factor analysis, was they looked at what have we done in the past. They didn't think about what exists now that we have not yet charged. But this is not the – I mean, if this is what Chavez says, it's just wrong. But I think you're seriously over-reading Chavez. I mean, it says it's backward-looking, but it doesn't only say it's backward-looking as to people who have actually been accused of misconduct. Otherwise, the first person to do it may not have any comparables, even though all of her other colleagues have done the exact same thing and not been charged. I mean, particularly if it's a policy, maybe it's not a formal policy, but if it's a practice that time and attendance is ignored, you have to look at how the policy is applied to everybody. And you didn't do it here. Let me ask you hypothetically. If instead of being the first person to be investigated, Ms. Miskell was the last person, and of all the other eight people, two of them were counseled, the rest of them had nothing done, and she was removed, no other extenuating circumstances, would that satisfy the Douglas factors? Would her removal penalty stand up? So I guess to explain the two counselings first, that was based on a supplemental analysis. And if it's okay with the court, I – Right. The reality is, though, if she was the last person, she would have gotten better too, right? I mean, so you're saying that forget what they did as of the point of time when she was charged, because after she got charged, they started behaving themselves. Well, you know what? If she wasn't the first one charged, she probably would have started being better about her time and attendance records too and would have gotten nothing. It's possible. I mean, it requires a little bit of speculation to know precisely what she would have done. What we do know, though, is the supplemental analysis for these eight other comparators that ultimately resulted in the two counselings was based on more timely information because the analysis that was provided to the SSA analyzed information based on time and attendance between 2011 and 2013. That information – Right. The relevant timeframe. Right. It is the relevant timeframe, but the verification analysis was provided to the SSA in 2015. According to the party CBA, they needed more timely information to take an action. What they found between the period of 2013 and 2015 was a vast improvement in these employees' conduct. Of course. Of course. Sorry. That's to be expected. But this is the problem with your argument. They didn't do a proper analysis at the time of her removal. If they'd done a proper analysis and said, look, she's doing this all, but all these other people are doing the same thing, either they'd remove them all or, more likely, they'd do some counseling or do a short three-day suspension when they're like, because you've obviously said, and they clearly did get better after somebody was made an example of, but you can't pick out one person arbitrarily and impose a harsh penalty on them when everybody else is doing the same thing. Well, the reason why that improvement had to be taken into account was – No, no, I get it. If you waited two years and then tried to remove them on conduct that occurred that much earlier, he would be up here arguing that that was improper under the union rules, too, and he would win. He has to do that. That doesn't solve your argument as to why the agency didn't properly consider the Douglas factor for Ms. Miskell. Well, so – and again, this goes back to the SSA as they understood the Douglas factor. They understood the Douglas factor to be looking backwards at precedent information. What Chavez said was, normally it's backward-looking. We can look at contemporary – Chavez also said you can look at post-discipline penalty if it's relevant, post-penalty information if it's relevant. Right. And Chavez, as Judge Hughes pointed out, did not limit it only to charged conduct. It says you look backwards, but you're supposed to look at how all employees were treated. It's employees engaged in similar conduct, not employees who got caught. Well, in that case, the specific holding was – this is our understanding – was that the two individuals were part of the same investigation, so that because that information came to the agency's attention contemporaneously or as part of the same investigation, they treated the individuals as similarly situated for that purpose. I mean, here we're looking at something different. Well, if that's the only way you get to similarly situated under Douglas, then Chavez is wrong. Yeah, it seems to undermine the whole idea if you can just pick whoever's going to be charged or other people who are engaging in the same conduct and say they're not comparable because they weren't charged. It just makes no sense. I guess what I come back to is I don't think there's any evidence in the record that shows that the SSA was being nefarious in any way to Ms. Miskell. It doesn't matter. It doesn't mean that they picked her out. It means they were negligent in their Douglas factors because there was a group of people all acting the same way. We have evidence of that now. You don't dispute it. And they treated her differently without doing a proper investigation. Well, so I guess what we come back to is this idea that any time an employment action is taken against any individual, you have to take in the six Douglas factor analysis and do an investigation of everyone to see whether the misconduct is... whether you have information about that occurring or not, whether it came through a specific source or not. Just before you take an action on a single individual, you have to look at the entire agency or an entire... And it's not hard when you've got the kind of records that we're talking about. I mean, I guess for this specific instance, maybe it wouldn't be that difficult, but I guess it's hard to fault, you know, the DNE or the SSA to say, you know, is this required under the law? Their understanding of the law at the time was, we look backwards. What have we done in the past for these individuals who have done the same thing in our recent history? Well, if that's your understanding and SSA's understanding, that's just wrong. It's people who have done the same conduct, not people who have been penalized the same way. And look, I get it. This is not... I do think that there's a line here. It's not that SSA has to look across its entire, you know, 100,000-person agency and say, is everybody doing time and attendance abuse treated the same way? This is the same eight-person office. You would think that a supervisor would have to treat his or her people right under his supervision the same way. It seems like it does stretch it if we impose some kind of broader search on the agency, but at least the same office, he has to have some idea or be on notice that his employees may be doing time and attendance abuse, and he can't single out one of them. You know, I guess what this comes down to is the subjective awareness of the SSA. You know, what the record shows is the SSA didn't become aware of it until the verification... They had objective data from which they could become aware of it. It's a very different thing than saying, well, you know, you have to go out and do some, you know, deep investigation or research. It was simple, objective data that was available at that moment. And to your end, and I think that's a point, that in hindsight, could they and should they have been aware of it? I think you could make that case. Can I ask you, if we vacate and remand this, do you think it's appropriate for us to tell the arbitrator to reopen the record to reconsider the results of the investigation? I don't, Your Honor, and it goes back to precisely... I mean, aren't you going to lose if you don't? Well, no, because I think there's an alternative grounds to say that, you know, even if the Sixth Douglas factor wasn't considered with, you know, to the court's satisfaction, sufficient analysis, what we have is, you know, the conduct that wasn't denied ultimately. You know, we have 400 instances... But it goes to the whole seriousness of the offense. You're trying to take that factor and make it sort of a standalone thing that has nothing to do with the ultimate punishment. But the whole point is, if this was not treated as a serious matter and the supervisor let everybody in the department do it and nobody else gets penalized for it, then maybe it's not so serious that it could ever justify discharge. And I guess I'd push back against that a little bit. It's not that the supervisor was allowing it to happen. If anything, it's that the supervisor wasn't aware it was happening to such a widespread degree. Of course he was allowing it to happen. He was a bad supervisor. He wasn't paying attention to what was happening in his office. I bet he's the one that personally signed the time and attendance report. I mean, you're right. In some sense, this is a very serious offense. But if the agency didn't care about it enough to monitor people's time and attendance, then in their view, it wasn't serious. And then also, if other people who were engaged in similar or the same activity weren't penalized or weren't even charged, then similarly, it shows it wasn't serious. Well, you know, in the supervisor's defense, he did come on the job in 2015. And as soon as he was alerted to two specific instances of people engaging in these timekeeping improprieties, he did what he was supposed to do.  of suggesting removal in the first instance. That person chose to resign. And then ultimately going through the grievance process and removing the second individual. When it came to... You're out. I understand. Well, thank you, Your Honor. I appreciate it. You have about three and a half minutes left. I think it's apparent that Ms. Miskell was singled out. Turning a blind eye is not a defense. Do you think it's procedurally that we... I mean, I know we can do what we want to do, but is it procedurally appropriate to tell the arbitrator to reopen the record? I mean, I'm a little uncomfortable because it's a lot of evidence after the fact. On the other hand, I think we need to know what the results of this investigation are. I think it would be appropriate. You know, I said at the very outset of my argument there were two reasons to take the appeal. One was to get relief for Ms. Miskell and the other is to make sure arbitrators adhere to the law. You know, no specific criticism, but, you know, I arbitrate a lot of cases and I think things get kind of loosey-goosey if I could put it in the vernacular, and I apologize for doing so. So I think instructions from the court are important. You know, in the day, arbitrators always thought that their opinions should instruct the parties about their future conduct. So regardless of what the disposition of the grievance was, they would say, you know, similar to the questions that the bench just asked counsel. You know, why didn't you do this? Or, you know, you've got a problem because you didn't do something. Even though I might ultimately rule against the party that I'm criticizing. I mean, rule for the party that I'm criticizing. So I don't know that there's anything more I need to say. I'm glad to answer any other questions. Thank you. Thank you, Your Honor. I appreciate the time.